```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                  WESTERN DIVISION
```

UNITED STATES OF AMERICA

VERSUS                                    CRIMINAL NO. 5:07cr8-DCB-JCS

CARLOS AUGUSTINE                                             DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Carlos Augustine's Motion to Suppress [**docket entry no. 10**]. An evidentiary hearing was held on May 23, 2007 in Jackson, Mississippi. Having reviewed the motion, briefs, applicable statutory and case law and being otherwise fully advised as to the premises, the Court finds as follows:

### GENERAL BACKGROUND & PROCEDURAL HISTORY

On January 31, 2007, a contract driver for the United States Postal Service was robbed while making a delivery to the Bentonia, Mississippi Post Office. Robert Gechijian, the postal inspector charged with investigating the robbery, compiled a list of possible suspects. One such suspect was Delphia Augustine, who at one time drove the Bentonia postal route. At 9:00 p.m. on March 1, 2007, Mrs. Augustine, the defendant's wife, voluntarily consented to an interview with Gechijian at the U.S. Postal Inspector's Office in Jackson, Mississippi. Mrs. Augustine is currently a contract driver for the postal service.

During the interview Inspector Gechijian asked Mrs. Augustine

-1-

if she knew where her husband, Carlos Augustine, was the night of the robbery. Mrs. Augustine responded that she did not know where he was on the night of January 31, 2007. Mrs. Augustine then invited Inspector Gechijian to her house so that he could question her husband. At the conclusion of Mrs. Augustine's interview, Gechijian and two other postal inspectors went to the Augustine household in Brandon, Mississippi to question Carlos Augustine. During Inspector Gechijian's interview of the defendant, Mr. Augustine made various inculpatory statements which he now seeks to suppress pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). In addition, the defendant requests suppression of a .38 revolver which was found at his residence. Lastly, Augustine seeks to suppress the statements that he made after he was formerly arrested.

## HEARING AND FACTS

On May 23, 2007, an evidentiary hearing was held in Jackson, Mississippi. In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues. U.S. v. Willis, 525 F.2d 657, 659 (5th Cir. 1976); see Fed. R. Evid. 104 cmt. (1972) ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact."). Inherent in this duty to resolve disputed questions of fact, the Court is required to determine the credibility of witnesses. Id.

On the night of March 1, 2007, Delphia Augustine invited

Inspector Gechijian and two other inspectors to her house in Brandon, Mississippi with the purpose of questioning Carlos Augustine about the Bentonia postal robbery.  After a fifteen minute drive from the inspectors' office, the inspectors and Mrs. Augustine arrived at the Augustine household in Brandon, Mississippi at 10:00 p.m.  Upon arriving at the house, Inspectors Gechijian and Martin waited at the end of the defendant's carport near the driveway while Mrs. Augustine approached her front door.[1] Mrs. Augustine was met at the door by the defendant, and she informed him that "the postal inspectors wanted to talk to him." (Delphia Augustine's direct examination, Tr. at 41.)  Since Mr. Augustine was wearing only a "slingshot" undershirt and boxer shorts, Mrs. Augustine went into the house to get the defendant some additional clothes.  When she came back outside, Carlos was leaning against a car in his carport and was talking to Inspectors Gechijian and Martin.

Inspector Gechijian testified that he and Inspector Martin were in plain clothes and unmarked vehicles when they arrived at the defendant's house.[2]  The parties disagree as to how the

---

[1] Both the defendant and Mrs. Augustine testified that they never saw the third inspector.

[2] Mrs. Augustine testified that she did not notice whether the inspectors were armed.  The defendant, however, stated that each inspector was carrying a handgun on his hip.  Inspector Gechijian testified that he could not remember whether his firearm was concealed or visible during the interview.

interview began.  The defendant asserts that the inspectors ordered him out of the house in his night clothes, while Inspector Gechijian maintains that he asked the defendant to speak with him and allowed the defendant to put on clothes before leaving the house.

When the defendant approached the inspectors under his carport, Inspector Gechijian introduced himself, he and Martin showed the defendant their badges, Gechijian explained that they were investigating the Bentonia robbery, and then Gechijian asked the defendant if he would answer some questions.  The defendant agreed.  After giving the defendant some general information about the investigation, Gechijian asked the defendant, "What was your involvement?"  The defendant then looked down, paused, and stated that he had robbed the Bentonia route driver.  At no point during this exchange was the defendant informed of his <u>Miranda</u> rights.

After the defendant's confession, Gechijian asked the whereabouts of the revolver used in the robbery.  After first claiming to have disposed of the firearm, the defendant admitted that it was in the house and offered either to retrieve it for the inspectors or to have his wife retrieve it.  Instead, Inspector Martin went to the door and requested that Mrs. Augustine show him where the revolver was located.  Once the revolver was obtained, the defendant was placed under arrest and transported to the postal inspectors' office in Jackson, Mississippi.

Inspector Gechijian testified that the inspectors were at the house for no more than ten minutes. Mrs. Augustine testified that the inspectors were at the house for twenty minutes.

Once at the inspectors' office, Gechijian testified that the defendant was read his <u>Miranda</u> rights and was provided with a written statement of his rights. Gechijian further testified that the defendant then signed a written waiver of his rights and submitted to a more detailed interview by Inspector Gechijian. The waiver form, which was submitted to the Court as an exhibit, indicates that the defendant signed the document at 10:43 p.m.

Carlos Augustine, on the other hand, testified that after he was transported to the inspectors' office, he was questioned first, and Mirandaized second.

**I.   Was the Defendant "In Custody" During the Initial Interview?**

It is undisputed that Augustine was not read his Miranda rights before Inspector Gechijian interviewed him under the carport. The defendant contends that he was "in custody" for <u>Miranda</u> purposes when he was initially questioned by Inspector Gechijian; thus, the defendant argues that he is entitled to suppression of any inculpatory statements made during the interview. The government maintains that the defendant voluntary agreed to be interviewed. The government further asserts that Augustine was not in custody at any point during the interview until the formal arrest.

Miranda requires the "suppression of statements stemming from custodial interrogation in which the defendant is not apprised of his rights." United States v. Brathwaite, 458 F.3d 376, 382 (5th Cir. 2006). To show a Miranda violation in the Fifth Circuit, the defendant carries the initial burden of proving that he was "in custody" within the meaning of Miranda while being interrogated.[3] United States v. Wells, 755 F.2d 382, 390 (5th Cir. 1985); United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984) (overruled on other grounds). A suspect is in custody for Miranda purposes "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to

---

[3] Some courts have placed the burden on the government to show that the defendant was not "in custody" when interviewed. See United States v. Paiz, 2007 WL 1052891, *3 (N.D. Cal. April 5, 2007); United States v. Nanos, 2006 WL 3469633, *7-8 (D. Me. Nov. 3, 2006); United States v. Etchison, 2005 WL 3088343 (E.D. Mich. 2005); United States v. Gallo, 2000 WL 852453 (D. Conn. 2000); United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997); Griffith v. Jones, 283 F. Supp. 794 (N.D. Ga. 1967) (granting petitioner's habeas corpus petition).
  Several other courts, however, remain in accord with the Fifth Circuit's position and place the initial burden on the defendant to show that he was actually "in custody." See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997) (Silberman, J., concurring) ("[I]t is the appellant's burden to establish factually that he was in custody as a pre-condition to an argument that the Constitution protects his silence in that situation."); United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006); United States v. Swanson, 2006 WL 335849 (S.D. Ohio 2006); United States v. Bishop, 2006 WL 167953 (W.D. Pa. 2006); Etheridge v. Johnson, 49 F. Supp. 2d 963 (S.D. Tex. 1997); United States v. Koontz, 1997 WL 33559173 (N.D. Iowa 1997). If the defendant sustains his burden, the burden then shifts to the government to show that the defendant knowingly, voluntarily, and intelligently waived his Fifth Amendment rights. North Carolina v. Butler, 441 U.S. 369 (1979).

constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988). Augustine had not formally been arrested when Inspector Gechijian initially questioned him; accordingly, the issue at bar is whether a reasonable person in Augustine's position would have understood the situation to constitute a restraint on his freedom of movement akin to that associated with formal arrest. "The reasonable person through whom the court must view this situation must be 'a person who is neutral to the purposes of the investigation–that is, neither guilty of criminal conduct and overly apprehensive nor insensitive to the seriousness of the circumstances.'" United States v. Eff, 444 F. Supp. 2d 731, 738 (E.D. Tex. 2006), quoting Bengivenga, 845 F.2d at 596.

The Fifth Circuit has identified several factors to aid the district courts in determining whether a defendant was "in custody" for Miranda purposes. These factors include (1) the length of the questioning, (2) the location of the questioning, (3) the number of officers present during questioning, and (4) the type and manner of the questioning. United States v. Fike, 82 F.3d 1315, 1325 (5th Cir. 1996); see also United States v. Dixon, 2006 WL 2054390 (E.D. La. July 20, 2006).

The length of questioning favors a finding that the defendant was not in custody during the initial interview. The Fifth Circuit

has "expressed concern that detentions which last more than an hour 'raise considerable suspicion.'" United States v. Harrell, 894 F.2d 120, 124 n.1 (5th Cir. 1990), quoted in Fike, 82 F.3d at 1325. According to Mrs. Augustine, the inspectors were at her house for no more than twenty minutes. In Fike, the Fifth Circuit held that a fifteen-minute interrogation which accompanied the execution of a search warrant (that went on for several hours) was no more than a brief detention. 82 F.3d at 1325; see also United States v. Roy, 2000 WL 1732669, at *4 (D. Me. 2000) (holding that interview lasting between twenty and thirty minutes did not constitute "custody" for Miranda purposes). Assuming that the inspectors were at the Augustine household for twenty minutes, only a portion of that time was taken up by Inspector Gechijian's questioning. The twenty minutes also included the time it took for the defendant to dress, the time needed for Inspector Martin to retrieve the revolver, and the time it took for the defendant to be formally arrested and placed in the inspector's vehicle. Thus, the length of questioning factor weighs in favor of the government.

Similarly, the fact that the questioning occurred at the defendant's residence weighs in favor of a finding that the defendant was not in custody. In United States v. Dixon, the Eastern District of Louisiana stated, "Courts consistently have held that Miranda warnings are not required during interrogations conducted at the suspect's residence because the defendant is not

considered 'in custody.'"  2006 WL 2054390, *2 (E.D. La. July 20, 2006) (citations from the Sixth, Eighth, and Tenth Circuits omitted).  Although the location of the interview is merely a single factor to be considered in the analysis, case law evinces a clear trend of courts finding questioning to be non-custodial when it occurs in or near the suspect's residence.  See United States v. Fike, 82 F.3d at 1325 ("The second factor, the location of the [questioning], weighs in favor of the Government's position because questioning in one's own home in the presence of other family members is less coercive than questioning a station house or other official location.").  In the case at bar, the defendant's wife invited the inspectors to the house to question her husband.  See United States v. Hurtado, 899 F.2d 371, 375 (5th Cir. 1990) (*en banc*) (noting that the defendant invited the questioning officers into her home).  Moreover, the defendant was interviewed in a location with which he was intimately familiar, i.e., his own carport, and during the interview his wife was within earshot.  No evidence was presented to indicate that the inspectors threatened the Augustine family.  Accordingly, the location factor weighs in favor of the government.

The third factor, the number of officers present during questioning, also weighs in favor of the government.  Three inspectors went to the defendant's residence, but only Inspectors Gechijian and Martin were visible.  Both the defendant and his wife

testified that they were unaware of the third inspector, who remained at the end of the driveway near his vehicle. See United States v. Martin, 2003 WL 22736553, at *4 (W.D. Tex. 2003) (denying defendant's motion to suppress where two FBI officers questioned him without first providing Miranda warning); Roy, 2000 WL 1732669, at *4 (finding that the presence of four officers during question weighed in favor of the government). The number of officers present during questioning factor measures against the defendant's position.

The fourth factor requires the Court to consider the type and manner of the questioning. Inspector Gechijian's testimony regarding the defendant's initial admission was not contradicted. The inspector testified that after he introduced himself to the defendant and explained what evidence he had uncovered, he then asked the defendant, "What was your involvement?" Gechijian stated that the defendant then looked down, paused, and declared that he robbed the Bentonia route driver. The Court was presented with no evidence that the inspectors were rude, aggressive or threatening in any away. As with the other three, this factor weighs in favor of the government.

In light of the four Bengivenga factors, it is apparent that the defendant was not "in custody" during the initial questioning. A reasonable innocent person would not feel as though he was arrested simply because two plain-clothed postal inspectors

approached his residence and requested to speak with him. Moreover, the fact that the defendant's wife invited the inspectors to the house would have the effect of allaying any fears held by a reasonable person. As such, the Court finds that the defendant was not in custody within the meaning of Miranda when he was asked about his involvement in the Bentonia robbery. Therefore, the defendant's statement that he robbed the Bentonia route driver should not be suppressed.

The Court further finds, however, that the defendant's admission did create a custodial situation. A reasonable person under the circumstances, i.e., after admitting one's guilt, would reasonably conclude that he was not free to move about at will or terminate an interview with officers. Inasmuch as it is undisputed that the defendant was never advised of his Miranda rights while being questioned in his carport, any questioning that occurred after the defendant's admission violated Miranda and must be suppressed.

**II.  Should the Revolver Obtained from the Augustine Residence be Suppressed as the Fruit of an un-Mirandaized Statement?**

The defendant also contends that the revolver found at his residence should not be admitted at trial since it was the fruit of

an un-Mirandaized statement.[4]  Bengivenga is again instructive on this issue.  "A violation of Miranda rules, rules fashioned to secure the Fifth Amendment's privilege during custodial interrogation, necessitates only the exclusion of testimonial evidence from the prosecution's case in chief."  Bengivenga, 845 F.3d at 600.  The Bengivenga court further held that the fruit of the poisonous tree doctrine is not triggered by a Miranda violation.  Id. at 601.  See also United States v. Patane, 542 U.S. 630, 637 (2004) (plurality opinion).  The Miranda protections themselves are not constitutional; rather, they are prophylactic measures intended to protect the defendant's right against compelled self-incrimination.  If the Court was presented with an actual constitutional violation, such as a coerced confession, the fruit doctrine would work to require suppression of any derivatively obtained nontestimonial physical evidence.  As previously mentioned, however, the facts do not support a finding of coercion.[5]

---

[4] Although the defendant argued in his brief that the discovery of the revolver was the fruit of a coerced statement, the facts gleaned from the evidentiary hearing do not support this argument. During his direct testimony at the hearing, the defendant testified that he was not threatened by the officers.

[5] The Court notes that the burden lies with the government to prove that the inculpatory statements were voluntarily made and not the product of coercion.  The government has met its burden. United States v. Eff, 444 F. Supp. 2d 731, 739 (E.D. Tex. 2006), citing United States v. Scurlock, 52 F.3d 531, 536 (5th Cir. 1995).

**III. Should the Defendant's Post-Arrest Statements be Suppressed?**

The defendant's final argument focuses on his post-arrest statements which were made in response to Inspector's Gechijian's questioning at the Jackson, Mississippi postal inspectors' office. It is undisputed that the defendant ultimately waived his Miranda rights. The defendant contends that he was first questioned, then read his Miranda rights. Inspector Gechijian maintains, however, that upon arrival at the Jackson office, and before any questioning, the defendant was read his Miranda rights, provided with a written copy of such rights, and executed a signed waiver of his rights.

In support of his argument, the defendant points to two pieces of documentary evidence. First, the defendant put forth the signed waiver, which indicates that the defendant waived his Miranda rights at 10:43 p.m. on the night of March 1, 2007. Second, Augustine relies on Inspector Gechijian's "Memorandum of Interview," which listed the time of interview to be 10:00 p.m. The memorandum also listed the place of interview to be the inspectors' office in Jackson; therefore, assuming that both the time of interview and place of interview are correct, it appears that the defendant was Mirandaized after the interview.

By way of explanation, Inspector Gechijian testified that he

typed the memorandum the morning after the interview took place.[6] The inspector stated that the 10:00 p.m. time listed on the memorandum was nothing more than a typographical error that he made. Moreover, Inspector Gechijian testified that he Mirandaized the defendant and obtained a waiver before beginning any questioning concerning the details of the robbery.

A careful review of the facts reveals that the notation in the memorandum which lists the time of interview as 10:00 p.m. was made in error. Delphia Augustine testified that the inspectors arrived at her house in Brandon, Mississippi at 10:00 p.m., interviewed her husband for twenty minutes, and then returned to the inspectors' office in Jackson, which is a fifteen minute drive. Inspector Gechijian's memorandum contains a detailed account of the robbery, and, according to the defendant's testimony, these details were not discussed during the initial interview; rather, the details of the robbery were only examined during the formal questioning which occurred at the inspectors' office. The only logical conclusion is that the memorandum's stated time of interview was inaccurate. Thus, the time discrepancy between the defendant's signed <u>Miranda</u> waiver and Inspector Gechijian's memorandum does not support the defendant's contention that he was questioned at the inspectors' office before being Mirandaized.

---

[6]The memorandum does not include the date it was typed. The only date listed on the memorandum is the date of interview.

Moreover, the time line of events supports Inspector Gechijian's testimony that he obtained a Miranda waiver from the defendant before questioning him about the details of the robbery. Mrs. Augustine's testimony indicates that the defendant arrived at the inspectors' office at approximately 10:35 p.m. Once at the inspectors' office, the defendant signed a written Miranda statement and a Miranda waiver. Carlos Augustine signed the Miranda statement at 10:42, and he signed the waiver at 10:43. Therefore, for the defendant to have been questioned before being warned of his rights, the questioning could only have lasted approximately seven minutes. Inspector Gechijian's memorandum delves much deeper into the circumstances surrounding the robbery than that which could have been gleaned from a mere seven minute interview. Accordingly, the Court, after carefully weighing the testimony of both the inspector and the defendant, finds that the defendant was instructed of his Miranda rights and gave a knowing, voluntary, and intelligent waiver of those rights. Thus, the statements made by Augustine while in custody at the Jackson, Mississippi inspectors' office should not be suppressed.[7]

---

[7]The defendant has not argued that these subsequent statements should be suppressed in light of the un-Mirandaized statements that he had previously made concerning the location of the revolver. In any event, it is doubtful whether the oft called "cat out of the bag" doctrine would apply to the current facts. Although the Court finds that the defendant was in custody for Miranda purposes at the time he admitted to committing the robbery, he was not questioned about the details of the robbery until after he waived his Miranda rights. To borrow from the common parlance associated with the

**CONCLUSION**

Since the defendant was not "in custody" at the time he admitted to committing the Bentonia, Mississippi robbery, his inculpatory statements should not be suppressed. The defendant is entitled to suppression, however, of the statements he made after he admitted his guilt but before being apprised of his Miranda rights. These statements include those made by the defendant concerning the location of the revolver and any statements made during transport to the inspectors' office in Jackson, Mississippi. Inasmuch as the fruit of the poisonous tree doctrine does not require suppression of non-testimonial physical evidence, the revolver obtained as a result of the un-Mirandaized – but nevertheless voluntary – statements should not be suppressed. Finally, the defendant's statements which were made while at the inspectors' office should not be suppressed because they were the product of a knowing, voluntary, and intelligent Miranda waiver. Accordingly,

IT IS HEREBY ORDERED that the defendant's Motion to Suppress

---

doctrine, the cat was still in the bag at the time the defendant was Mirandaized and questioned concerning the details.

[**docket entry no. 10**] is **GRANTED IN-PART** and **DENIED IN-PART**.

    SO ORDERED this the ___6th___ day of ___June___, 2007.

                                               ___s/David Bramlette___
                                               UNITED STATES DISTRICT JUDGE